R. Brent Wisner, Esq, (SBN: 276023)
rbwisner@wisnerbaum.com
Stephanie B. Sherman, Esq. (SBN: 338390)
ssherman@wisnerbaum.com
**WISNER BAUM, L.L.P**
11111 Santa Monica Boulevard, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Attorneys for Plaintiffs and Putative Classes*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ALAN MONTENEGRO; MELISSA MEDINA; BRENDA MORGAN, CHERYL POWERS, JENNY QU, DANIEL FELDTKELLER, LESLIE LAMAY, KAYLEIGH SCHNEIDER, VERUNIKA DUJMOVIC, ABDALLAH AL-QUDSI, MARILYN SAAVEDRA, JOHNE CONTE, STARNELLA HARDER, ALEXANDRA DONATO, JOSEPH LONG, NOAH LONG; ROBIN COREY; and DANIEL CALZADO on behalf of themselves, and all others similarly situated, and the general public, | Civil Action No. 2:24-cv-01895-SB-BFM |
| | **CLASS ACTION FIRST AMENDED COMPLAINT** |
| | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| JOHNSON & JOHNSON CONSUMER, INC. and KENVUE, INC.; and DOES 1 to 50, Inclusive, | |
| Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................1

THE PARTIES........................................................................................................6

JURISDICTION AND VENUE ...............................................................................18

GENERAL ALLEGATIONS ....................................................................................18

I.     DEFENDANTS MARKETED THEMSELVES AS COMMITTED TO
SCIENCE AND SAFETY ....................................................................19

II.    DEFENDANTS DID NOT ADEQUATELY TEST THE BPO
PRODUCTS BEFORE SELLING THEM TO THE PUBLIC ..................20

III.   DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE BPO
PRODUCTS DEGRADED TO BENZENE WHEN EXPOSED TO
NORMAL USE, HANDLING, AND STORAGE CONDITIONS ............22

IV.   BENZENE WAS FOUND IN OTHER JNJ PRODUCTS BUT JNJ DID
NOT TEST THE BPO PRODUCTS FOR BENZENE ............................24

V.    DEFENDANTS IGNORED FDA'S ALERT TO TEST FOR BENZENE 25

VI.   RECENT TESTING FOUND BPO PRODUCTS CONTAIN
DANGEROUS LEVELS OF BENZENE AND DEGRADE DURING
REGULAR TRANSPORT AND HANDLING.........................................26

VII.  DEFENDANTS EXPOSED CONSUMERS TO A RISK OF BENZENE
EXPOSURE WITHOUT THEIR KNOWLEDGE ....................................31

VIII. DEFENDANTS DIRECTLY MARKETED THE BPO PRODUCTS TO
CHILDREN AND TEENAGERS WITHOUT DISCLOSING THE RISK
OF BENZENE CONTAMINATION ..........................................................36

IX.   PUNITIVE DAMAGES ALLEGATIONS..............................................37

X.    PLAINTIFF-SPECIFIC ALLEGATIONS ...............................................38

XI.   CLASS ACTION ALLEGATIONS .........................................................55

XII.  CAUSES OF ACTION ..........................................................................59

       A.    VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
BUS. & PROF. CODE § 17200 *et seq.*, *Individually and on Behalf of
the California Subclass* .............................................................59

       B.    VIOLATION OF CALIFORNIA'S CONSUMER LEGAL
REMEDIES ACT, Cal. Civ. Code § 1750, et seq., Individually and
on Behalf of the California Subclass ...............................................62

ii

C.   FALSE ADVERTISING UNDER VARIOUS STATE STATUTES, Individually and on Behalf of the California, Hawaii, and New York Subclasses ........................................................................ 64

D.   DECEPTIVE TRADE PRACTICES UNDER VARIOUS STATE STATUTES, Plaintiffs, Individually and on Behalf of California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses ................................................... 67

E.   BREACH OF EXPRESS WARRANTY, Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses ................................................... 72

F.   BREACH OF IMPLIED WARRANTY, Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses ................................................... 73

G.   UNJUST ENRICHMENT, Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses ........................................................................ 74

XIII.  PRAYER FOR RELIEF ............................................................ 75

XIV.  DEMAND FOR JURY TRIAL ................................................. 76

iii

**<u>INTRODUCTION</u>**

1.     This is a consumer fraud Class Action to redress the economic harms caused by Defendants sale of benzoyl peroxide acne treatment drug products ("BPO Products") without warning consumers the BPO Products had the potent human carcinogen benzene, and that BPO Products degraded into benzene under normal use, handling, and storage conditions.

2.     The BPO Products are "drugs" used to treat acne vulgaris ("acne"), formulated with a chemical called benzoyl peroxide ("BPO"), along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars.

3.     It is undisputed within the scientific community that benzene is a potent human carcinogen, with no safe level of human exposure.  The U.S. Food and Drug Administration ("FDA") recognizes benzene as carcinogen that can cause cancer in humans[1] and classifies it as a "Class 1" solvent that must be "avoided" in drug manufacturing.[2]  The FDA allows one limited exception – where the use of benzene in a drug product is unavoidable to produce a drug product with a significant therapeutic advantage otherwise not available.  In that instance, benzene must be restricted to two parts per million (ppm).[3]  Defendants' BPO Products do not meet this rare exception— in other words, there should not be *any* benzene in BPO Products.

4.     A drug is "adulterated" if it consists in whole or in part of any filthy, putrid, or decomposed substance, is impure, or mixed with another substance.[4]  Under the Federal Food, Drug and Cosmetic Act ("FDCA"), it is a crime to introduce or deliver "into interstate commerce any food, drug, device, tobacco product, or cosmetic

---

[1] U.S. Food and Drug Administration, *Questions and Answers on the Occurrence of Benzene in Soft Drinks and Other Beverages,* (Feb. 25, 2022), https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages.
[2] U.S. Food and Drug Administration, *Q3C – Tables and Lists Guidance for Industry,* (June 2017), https://www.fda.gov/media/71737/download.
[3] Id.
[4] 21 U.S.C. § 351(a)(2011); see also § 351(b)-(d) (noting that a lack of purity or mixture with another substance also renders drug adulterated).

CLASS ACTION FIRST AMENDED COMPLAINT

that is adulterated or misbranded."[5] If benzene is found in any on-market or post-market product, the drug is adulterated, illegal, and the drug manufacturer must contact the FDA to initiate a voluntary recall.[6]

5.     BPO is a fundamentally unstable molecule that will degrade into benzene—a point illustrated by the identification of benzene in every BPO product tested.  This occurrence of benzene is exacerbated by exposure to heat—but it will form under normal, labeled, storage and transport conditions.

6.     Thus, all the BPO Products marketed and sold by Defendants to Plaintiffs, the putative Class members, and the public decomposed into benzene rendering them illegal for sale within the United States, unfit for human use, i.e., worthless, and materially different than advertised.

7.     In 2023, Valisure, LLC,[7] an accredited laboratory that has developed analytical methods to test drugs and consumer products for public safety, tested over a hundred samples of BPO and non-BPO products to determine whether any had benzene.  While nearly all BPO Products contained benzene; nearly none of the non-BPO acne products had detectable levels of benzene.

8.     Valisure also attempted to ascertain BPO product stability, using three sets of temperatures, 37°C/98.6°F, designed to simulate human body temperature, 50°C/122°F, used to evaluate shelf-life performance as an accelerated stability testing

---

[5] 21 U.S.C. § 331(a)(2011).

[6] U.S. Food and Drug Administration, *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* (Dec. 22, 2022), https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain (last visited Feb. 9, 2024).

[7] Valisure is an independent third-party analytical laboratory that is accredited to International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238).  In response to rising concerns about drug shortages, generics, and overseas manufacturing, Valisure developed and validated methods to test medications and consumer products distributed in the United States. Valisure has tested a variety of drug and consumer healthcare products for benzene including sunscreens, antiperspirants, body sprays, hand sanitizers, and dry shampoos for benzene. Valisure's testing results submitted to the FDA in its Citizen's Petitions, were widely publicized in the media leading to numerous recalls of contaminated consumer products. *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 5, 2024).

CLASS ACTION FIRST AMENDED COMPLAINT

temperature used by the pharmaceutical industry,[8] and 70°C/158°F, used to model storage in a hot vehicle.[9]  Benzene concentrations were measured at certain time intervals using GC-MS, and benzene findings were plotted in real time and reported in ppm.[10] Importantly, at baseline, before any heat or humidity was applied to these products, 94 of 99 (95%) of them contained benzene, some with levels that far exceed the 2-ppm limit imposed by FDA on products manufactured with benzene solvents (which are not applicable to BPO Products).

9.      Valisure's results confirm that on-market BPO Products degrade into benzene and can form levels up to hundreds of ppm when handled, used, or stored at expected and/or accelerated temperatures.[11]

10.     Valisure scientists also found that benzene was released into the surrounding air even when the BPO Products' packaging was *closed* raising concern for even more inhalation exposures—a particularly pernicious form of exposure to benzene.[12]  Consumers storing their BPO Products in a warm and humid environment, i.e., a small bathroom or car glove box, could see levels of benzene rise in the air similar to those seen in occupational settings, where benzene inhalation is closely monitored and controlled.  In contrast, the levels of benzene found in the 76 non-BPO products were null to *de minimus*.[13]

---

[8] Ghimire, Prakash et al., *Guidelines on Stability Studies of Pharmaceutical Products and Shelf-Life Estimation,* INTERNATIONAL JOURNAL OF ADVANCES IN PHARMACY AND BIOTECHNOLOGY, (2020), 06. 15-23. 10.38111/ijapb.20200601004.

[9] Grundstein A, Meentemeyer V, Dowd J. *Maximum vehicle cabin temperatures under different meteorological conditions,* Int J Biometeorol. 2009 May;53(3):255-61. doi: 10.1007/s00484-009-0211-x. Epub 2009 Feb 21. PMID: 19234721.

[10] Valisure's findings were reported to the FDA in its March 5, 2024 Citizen's Petition.  *See* Valisure, LLC, *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Acne Drugs,* (March 5 2024), https://www.valisure.com/valisure-newsroom/fda-citizen-petition-8-benzene-in-benzoyl-peroxide-products, pp 16-18.

[11] Id.

[12] Id. at 19.

[13] Id. at 15 ("76 non-BPO products had no detectable benzene or values below 0.1ppm. 6 non-BPO products contained traces of benzene below 2 ppm, which could be due to various inactive ingredients used in consumer products that have been theorized to contain trace benzene").

3

CLASS ACTION FIRST AMENDED COMPLAINT

11.     Valisure's testing data has been published in the prestigious peer-reviewed journal, Environmental Health Perspectives, and is incorporated herein by reference.[14]

12.     Valisure filed a FDA Citizen's Petition on March 5, 2024 demanding an immediate recall of all BPO Products.  To date, the FDA has not responded or ruled on the pending Citizen's Petition.  Further, it does not appear that any BPO Products manufacturers or sellers have voluntarily recalled any BPO Products, despite the Citizen's Petition and the peer-reviewed literature. Although the BPO Products have been found to have benzene, Defendants never listed benzene among its Products' ingredients, or anywhere on the Products' labels, containers, advertising or on Defendants' websites. Defendants never warned anyone the BPO Products had benzene or were at risk of benzene contamination.

13.     Defendants knew or should have known their BPO Products contain and/or degraded into benzene when exposed to expected consumer use, handling, and storage conditions.  BPO is known, within the scientific community (but not among consumers) to degrade into benzene according to the mechanism below:[15]

---

[14] Kucera K, et al., *Benzoyl Peroxide Drug Products Form Benzene,* 132 ENV. HEALTH PERSPECT. 3, 37702-1–3 (Mar. 14, 2024).

[15] The disposition of benzoyl peroxide to form benzene.  Benzoyl peroxide is known to thermally decompose to form two molecules of benzoyloxy radicals that can further decompose to benzoic acid or phenyl radicals with liberation of carbon dioxide. The phenyl radicals can then produce benzene.  See Shang-Hao, L., et al, *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide using DSC and TAM III,* 605 THERMOCHIMICA ACTA 68-76 (2015).

CLASS ACTION FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8



14.    Defendants misled the Plaintiffs, the putative Class members, and the general public by representing their BPO Products only had the ingredients listed on the labels, packaging, containers, and websites promoting the BPO Products.  Defendants misled the Plaintiffs, the putative Class members, and the general public by representing that BPO Products were safe while concealing material information that BPO Products are contaminated and degrade into benzene.  Defendants further misled Plaintiffs, the putative Class members, and the public by assigning long expiration dates of 2-3 years, leading consumers to believe the BPO Products were safe for use for years when Defendants knew or should have known the BPO Products degrade into benzene within days or were contaminated by the time the BPO Products were first used by the consumer.  Defendants' BPO Products' statements and omissions of material health and safety information are prohibited deceptive trade practices and constitute false and deceptive advertising pursuant to the various state consumer laws alleged herein.  Indeed, Defendants unreasonably placed Plaintiffs, the putative Class members, and the public at risk of exposure to benzene which, in turn, increases the risk of cancer by increasing a person's overall benzene exposure, without their knowledge or consent.

15.    Because of the Defendants' misconduct and consumer deception, the Plaintiffs and the putative Class members were economically harmed, as they bought products they otherwise would have never bought, receiving a product that was unfit

5

for human use, i.e., worthless, was not what it was purposed to be, was illegal for sale in the United States, and/or had value below the price paid.  They were also physically harmed by being exposed to benzene, which increased their lifetime exposure burden to benzene which, in turn, increased the risk of various cancers.

16.    This Class Action is necessary to redress the economic harms caused to the Plaintiffs and the putative Class members who bought Defendants' BPO Products. This Class Action is further necessary to expose Defendants' ongoing consumer fraud and to enjoin Defendants from continuing their misconduct to protect consumers and public health.

17.    Plaintiffs bring this Class Action individually, and on behalf of those similarly situated, and seek to represent a National Class of consumers and State Subclasses of consumers (defined *infra*) who bought Defendants' BPO Products. Plaintiffs seek damages, reasonable attorneys' fees and costs, interest, restitution, and all other equitable relief, including an injunction and disgorgement of all benefits and profits Defendants received from their misconduct.

## **THE PARTIES**

18.    Plaintiff Alan Montenegro is a California resident, located in Los Angeles County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from 2017 to 2021.  Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products. As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States,

6

1  and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body

2  burden of benzene was increased by exposure to benzene in Defendants' BPO products

3  and this increased exposure to benzene increased Plaintiff's overall risk of developing

4  cancer.

5        19.    Plaintiff Melissa Medina is a Nevada resident, located in Carson County

6  who bought BPO Products including Clean & Clear Continuous Control Acne Cleanser

7  from September 2020 to May 2023. Because BPO naturally degrades into benzene

8  under normal storage and transport conditions (although, accelerated by exposure to

9  heat and humidity), all of Plaintiff's BPO products contained benzene, which was not

10 disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the

11 presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO

12 products.  As such, Plaintiff has suffered economic damages as a result of Defendants

13 violations of the state laws alleged herein.  Plaintiff would never have purchased

14 Defendants' BPO Products had Defendants warned about the presence of benzene or

15 that the BPO Products could degrade into benzene, was unfit for human use, i.e.,

16 worthless, was not what the BPO Product purported to be, was illegal for sale within

17 the United States, and/or contained less value than the price paid.  Additionally,

18 Plaintiffs' overall body burden of benzene was increased by exposure to benzene in

19 Defendants' BPO products and this increased exposure to benzene increased Plaintiff's

20 overall risk of developing cancer.

21       20.    Plaintiff Brenda Morgan is a California resident, located in Merced County

22 who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel,

23 J&J's Persa-Gel® 10, and Clean & Clear Continuous Control Benzoyl Peroxide Acne

24 Face Wash from 1980 to 2020. Because BPO naturally degrades into benzene under

25 normal storage and transport conditions (although, accelerated by exposure to heat and

26 humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed

27 to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence

28 of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.

As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

21.   Plaintiff Cheryl Powers is a California resident, located in San Diego County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from 2012 to 2022. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products. As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

22.   Plaintiff Jenny Qu is a California resident, located in San Francisco County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from July 2023 to October 2023. Because BPO naturally degrades into benzene under

normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

23.    Plaintiff Daniel Feldtkeller is a California resident, located in Santa Barbara County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from December 2006 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in

CLASS ACTION FIRST AMENDED COMPLAINT

Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

24.     Plaintiff Leslie LaMay is a California resident, located in San Diego County who bought BPO Products including Neutrogena Stubborn Acne AM Treatment from April 2021 to April 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

25.     Plaintiff Kayleigh Schneider is a Connecticut resident, located in Middlesex County who bought BPO Products including Johnson & Johnson's Persa-Gel® 10 from 2021 to April 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products. As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO

10

CLASS ACTION FIRST AMENDED COMPLAINT

Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

26.     Plaintiff Verunika Dujmovic is an Illinois resident, located in Cook County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel, Neutrogena Stubborn Acne AM Treatment and Neutrogena Stubborn Marks PM Treatment from 2015 to April 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene. It is a naturally occurring chemical reaction that affects all BPO products. As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein. Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

27.     Plaintiff Abdallah Al-Qudsi is an Illinois resident, located in DuPage County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from April 2009 to April 2023. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not

11

CLASS ACTION FIRST AMENDED COMPLAINT

disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

28.    Plaintiff Marilyn Saavedra Marilyn Saavedra is a Maryland resident, located in Baltimore County who bought BPO Products including Johnson & Johnson Persa-Gel® 10, Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, and Neutrogena Rapid Clear Stubborn Acne Spot Gel from September 2018 to April 2022. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

CLASS ACTION FIRST AMENDED COMPLAINT

29.    Plaintiff Johne Conte is a New York resident, located in Warren County who bought BPO Products including Neutrogena On-the-Spot Acne Treatment from August 2018 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products. As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

30.    Plaintiff Starnella Harder is an Ohio resident, located in Lorain County who bought BPO Products including Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash from September 2021 to 2023. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein. Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product

purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

31.    Plaintiff Alexandra Donato is a Pennsylvania resident, located in Delaware County who bought BPO Products including Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, Neutrogena Rapid Clear Stubborn Acne Spot Gel, and Neutrogena Stubborn Acne AM Treatment from 2021 to 2023. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

32.    Plaintiff Joseph Long is a Washington resident, located in Clark County who bought BPO Products including Johnson & Johnson's Persa-Gel® 10 from March 2023 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products.

14

As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

33.    Plaintiff Noah Long is a Washington resident, located in Clark County who bought BPO Products including Johnson & Johnson's Persa-Gel® 10 from March 2023 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene. It is a naturally occurring chemical reaction that affects all BPO products.  As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

34.    Plaintiff Robin Corey is a Washington resident, located in Clallam County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from July 2018 to February 2024. Because BPO naturally degrades into benzene under

15

normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products. As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products and this increased exposure to benzene increased Plaintiff's overall risk of developing cancer.

35.    Plaintiff Daniel Calzado is a New York resident, located in Monroe County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from May 2022 to May 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's BPO products contained benzene, which was not disclosed to Plaintiff prior to purchase.  Indeed, testing of this product line confirms the presence of benzene.  It is a naturally occurring chemical reaction that affects all BPO products. As such, Plaintiff has suffered economic damages as a result of Defendants violations of the state laws alleged herein.  Plaintiff would never have purchased Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid.  Additionally, Plaintiffs' overall body burden of benzene was increased by exposure to benzene in Defendants' BPO products

CLASS ACTION FIRST AMENDED COMPLAINT

1   and this increased exposure to benzene increased Plaintiff's overall risk of developing

2   cancer.

3       36.    Defendant Johnson & Johnson Consumer Inc. is a citizen of Delaware with

4   its principal place of business located in New Jersey.  Johnson & Johnson Consumer

5   Inc. is a subsidiary of Johnson & Johnson (JNJ).  Defendant sells BPO Products under

6   the brand names Clean and Clear and Neutrogena.  Defendant's BPO Products include,

7   *inter alia:* (1) Persa-Gel® 10, (2) Clean & Clear Continuous Control Benzoyl Peroxide

8   Acne Face Wash, (3) Neutrogena Rapid Clear Stubborn Acne Spot Gel, (4) Neutrogena

9   On the Spot Acne Treatment, (5) Neutrogena Stubborn Acne AM Treatment, and (6)

10  Stubborn Marks PM Treatment.  At all relevant times, Defendant conducted business

11  and derived substantial revenue from its manufacturing, advertising, marketing,

12  distributing, and selling of the BPO Products within the State of California.

13      37.    Defendant Kenvue, Inc. is a Delaware corporation with its principal place

14  of business located in New Jersey. Kenvue, Inc. is a subsidiary of JNJ, who (since

15  being spun out in about 2023) shares responsibility for consumer health products

16  including brands Clean and Clear and Neutrogena.[16]  At all relevant times, Defendant

17  conducted business and derived substantial revenue from its manufacturing,

18  advertising, marketing, distributing, and selling of the BPO Products within the State of

19  California.

20      38.    Defendants are collectively referred to hereinafter as "JNJ" or

21  "Defendants." Defendants and their agents promoted, marketed, and sold the BPO

22  Products in California and in this District.  Defendant Kenvue, Inc. conducted its

23  business practices, including promotion and marketing of its BPO Products, from its

24  Los Angeles, California headquarters until about April 2024.  The unfair, unlawful,

25  deceptive, and misleading advertising and labeling of the BPO Products were prepared

26  and/or approved by Defendants and their agents and were disseminated by Defendants

27

28  ───────────────
    [16] Kenvue, Inc., *Iconic Brands Rooted in Science*, https://www.kenvue.com/brands?q=clean
    (last visited May 24, 2024).

17

and their agents through statements, labeling and advertising containing the

misrepresentations alleged and disseminated uniformly through advertising, packaging,

containers, and via websites and social media.

## JURISDICTION AND VENUE

39.    This Court has jurisdiction over this matter because the amount in

controversy exceeds $5 million satisfying 28 U.S.C. § 1332(d)(2) for subject matter

jurisdiction. This Court has supplemental jurisdiction over any state law claims under

28 U.S.C. § 1367.

40.    Venue is proper in the Central District of California under 28 U.S.C. §

1391(b) because a substantial part of the events or omissions giving rise to the claims

occurred in this District.

41.    This Court has personal jurisdiction over the Defendants because

Defendants transact business in California, including in this District, has substantial

aggregate contacts with the State of California, including in this District, engaged in

misconduct that has and had a direct, substantial, reasonably foreseeable, and intended

effect of injuring people in this District, and Defendants purposely availed itself of the

benefits of doing business in the State of California, and in this District.  Additionally,

the claims by Plaintiffs arise out of and relate to the Defendants action within the State

of California and in this District.

42.    To the extent applicable, the Court also has pendant personal jurisdiction

over claims alleged against Defendants that involve the same common nucleus of facts

and actions that give rise to Plaintiffs' claims that otherwise have proper personal

jurisdiction within this Court.

## GENERAL ALLEGATIONS

43.    Fifty million Americans suffer from acne annually.[17] Acne is the most

common skin condition in the United States with a prevalence among adolescents of

_____

[17] American Academy of Dermatology Association, *Skin Conditions by the Numbers,*
https://www.aad.org/media.

CLASS ACTION FIRST AMENDED COMPLAINT

almost 95 percent.[18] Acne can begin as early as age seven and, for some, can persist through adulthood and into ages 50s and 60s.[19]  Millions of acne sufferers seek treatment every year making it a billion-dollar industry and a key business segment for Defendants, who are among America's most prominent companies.

## I.   DEFENDANTS MARKETED THEMSELVES AS COMMITTED TO SCIENCE AND SAFETY

44.    Defendants most profitable and well-known acne treatment products contain BPO.  To make the finished BPO Products, BPO, a dry white powder, is mixed with other ingredients to create topical drug creams, cleansers, scrubs, and washes for use on the face and body. BPO is formulated into these Products at concentrations up to 10%.  In manufacturing BPO, no use of benzene is required.  It is created by treating hydrogen peroxide with benzoyl chloride under alkaline conditions.

45.    JNJ is a household name familiar to every American.  JNJ started over 135 years ago and employs over 150,000 employees around the globe.  In 2022, JNJ's annual revenue was 94.9 billion dollars.   JNJ markets itself as a world leader in pharmaceutical and consumer healthcare innovation and research.  In 2022, JNJ spent $14.6 billion on research and development.   JNJ's business falls into three areas - pharmaceuticals, consumer health, and medtech.  JNJ's BPO Products, i.e., Clean & Clear and Neutrogena, fall under the consumer health umbrella that includes other widely used personal healthcare products such as Band-Aid, Neosporin, Tylenol, Motrin, Sudafed, Benadryl and Zyrtec allergy products and Johnson's and Aveeno baby care line of products.  In about 2023, JNJ spun out Kenvue Inc., for its consumer health business.[20] JNJ's Products are marketed and sold online to retail outlets and distributors throughout the world.

---

[18] JL Burton et al., *The prevalence of acne vulgaris in adolescence,* BR J DERMATOL, (1971), 85(2):119–126.·

[19] Id.·

[20] Linnane, Ciara, Johnson & Johnson is Selling Its Remaining Kenvue Shares, (May 13, 2024), https://www.morningstar.com/news/marketwatch/2024051391/johnson-is-selling-its-remaining-kenvue-shares.

**CLASS ACTION FIRST AMENDED COMPLAINT**

46.     JNJ marketed itself as a world class pharmaceutical and consumer health care product researcher, developer, and seller who devoted substantial resources to product development.  Indeed, JNJ reported that it spent $14.6 billion on research and development in 2023.

47.     Defendants marketed itself as a company committed to safety and science. JNJ told consumers: "we are driven by a responsibility to create science-backed skin care that everyone can access."[21]  On JNJ's website for Neutrogena®, JNJ said they "set a high bar for using ingredients…screening for quality, manufacturing process, government regulations, published and research…"[22] JNJ assured consumers, BPO is the number one dermatologist approved over the counter acne ingredient.[23]

48.     Defendants' broad claims of safety gave consumers a false sense of safety. Defendants' statements were meant to convey the BPO Products were safe and did not contain carcinogens such as benzene. Defendants made these statements uniformly to the public and through their websites, BPO Products' labels, containers, and advertising.

## II.     DEFENDANTS DID NOT ADEQUATELY TEST THE BPO PRODUCTS BEFORE SELLING THEM TO THE PUBLIC

49.     Despite Defendants' public affirmations of commitment to science, Defendants did not adequately test the BPO Products before selling them to consumers. Defendants' Products are "drugs" regulated by the FDA.  As with any regulated drug, Defendants must follow current good manufacturing practices ("CGMPs"), have scientifically sound specifications, and must have test procedures and processes to ensure the drug's components (active and inactive ingredients), and finished products are safe.  Both raw ingredient materials and finished batches must be tested before released to the public to confirm they meet specifications for identity, strength, quality,

---

[21] Johnson & Johnson Consumer Inc., Neutrogena, *Why Neutrogena?* https://www.neutrogena.com/why-neutrogena.html, (last visited October 7, 2023).

[22] Johnson & Johnson Consumer Inc., Neutrogena, *Product Testing,* https://www.neutrogena.com/ producttesting.html (last visited October 7, 2023).

[23] See Neutrogena Stubborn Acne AM Treatment container.

CLASS ACTION FIRST AMENDED COMPLAINT

and purity.[24]  If testing results of the raw materials or finished product do not conform with the specifications, the product cannot be sold to the public.  Defendants must also re-test any Products subject to deterioration.[25]  Any Products not made in conformity with the CMGPs is considered "adulterated" under 501(a)(2)(B) of the Food, Drug, and Cosmetic Act.[26]

50.    Defendants must also do stability testing to understand the "shelf life" of the Products and to assign an expiration date.  It is well known in the scientific community (but not among consumers) that certain chemical ingredients can degrade or change because of environmental, and storage conditions such as light, moisture, temperature, and humidity, or because of the passage of time. The stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods."[27] If stability testing finds a drug product is not stable under expected storage or use conditions, degrades, or create toxic byproducts, the product cannot be sold to the public.

51.    The CGMPs and stability test requirements are there to ensure drug products are safe for public use. These are the minimum requirements. Because the drug manufacturers such as JNJ are largely self-regulated, the FDA must rely on drug manufacturers, the public, and concerned citizens to report unsafe drugs. The FDA cannot force a drug manufacturer to recall a contaminated drug.[28]

---

[24] 21 C.F.R. § 211.84 (1978); see also 21 C.F.R. § 211.160 (1978).
[25] 21 C.F.R. § 211.160(b)(1)(1978).
[26] 21 C.F.R. § 225.1 (1976). Under 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act a drug is considered "adulterated" (poorer in quality by adding another substance) if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with CGMP; see also Food and Drug Administration, Facts About the Current Good Manufacturing Practices (CGMP); https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmp (last visited Feb. 11, 2024).
[27] 21 CFR 211.166.
[28] U.S. Food and Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMP)*, (February 16, 2024), https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmp.

---

21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.  DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE BPO PRODUCTS DEGRADED TO BENZENE WHEN EXPOSED TO NORMAL USE, HANDLING, AND STORAGE CONDITIONS

52.    Defendants knew or should have known the BPO Products degraded to benzene when exposed to normal use, handling, and storage conditions. Defendants knew that, because of the chemical nature of the active and inactive ingredients, including BPO, the BPO Products were not stable and would degrade when exposed to heat from normal distributor and consumer use, handling, and storage conditions.

53.    It is well known in the scientific community (but not among consumers) that BPO degrades to benzene when exposed to heat over time. This process was first reported in the scientific literature as early as 1936.[29]

54.    The degradation of BPO to benzene was known or should have been known to the Defendants, who promoted themselves as devoting substantial money and resources to science and research. Defendants marketed themselves as world class drug and healthcare researchers, developers, and sellers. Defendants employed high-level scientists, chemists, and researchers to formulate drug products for public use. Defendants have among of the most recognized acne brands and benefit from the financial gains by such recognition. Defendants, with these resources and expertise, were aware of the well-known chemical processes that degrade BPO Products into benzene when exposed to common use temperatures and conditions.

55.    Defendants further knew or should have known that specific ingredients derived from hydrocarbons increased the risk the BPO Products would yield benzene.[30] At-risk ingredients include carbomers, mineral spirits, and other petroleum derived substances. These ingredients are red flags for risk of benzene contamination. The FDA published guidance in 2022 urging the industry to reformulate drug products at risk of

---

[29] Erlenmeyer H., et al., *Über die thermische Zersetzung von Di-acyl-peroxyden,* 19 HELU. CHIM. ACTA 338 (1936).

[30] U.S. Food and Drug Administration, *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* (Dec. 22, 2022).

22

benzene contamination.[31]  The FDA's alert highlighted ingredients made from hydrocarbons, including carbomers (thickening agents), urging drug manufacturers to test products containing them for benzene contamination.[32] Many of the Defendants' BPO Products contain hydrocarbons and carbomers but none have been recalled due to benzene contamination.

56.    stability studies examining the "shelf life" of the BPO Products, the chemical changes took place because of normal and expected environmental, use, and storage conditions.

57.    Defendants knew or should have known the BPO Products would be handled, used, and stored by distributors, sellers, and consumers under various temperatures that affect chemical stability. Defendants knew or should have known the BPO Products would travel by commercial carriers and distributors in varying storage conditions and would be stored by consumers in handbags, backpacks, bathrooms, showers, lockers, and in vehicles during warm months where the BPO Products would be exposed to heat. Defendants knew or should have known consumers would apply the benzene contaminated BPO Products to their faces and bodies and would also use the BPO Products in heated showers as scrubs and washes. Defendants knew or should have known the BPO Products would be used and applied to the skin at normal body temperatures, and elevated temperatures following showers or baths, after physical activity, and after the BPO Products sat in warm temperatures or hot vehicles.

58.    These storage, use, and handling conditions were known or should have been known to Defendants before the BPO Products were marketed and sold to Plaintiffs, the Class, and Subclass members. Defendants knew or should have known the BPO Products degrade to benzene under these conditions exposing consumers to

---

[31] U.S. Food and Drug Administration, *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene,* (December 27, 2023), https://www.fda.gov/regulatory-information/search-fda-guidance- documents/reformulating-drug-products-contain-carbomers-manufactured-benzene.

[32] Id.

23

CLASS ACTION FIRST AMENDED COMPLAINT

benzene. Defendants further knew or should have known that, because of the known degradation of BPO to benzene, the BPO Products were contaminated with benzene by the time they reached consumers, but they sold them to Plaintiffs, the Class, the Subclass, and the public anyway, without warning of the risk of exposure. Moreover, the 2–3-year shelf life printed on the BPO Products told consumers they were safe for use for years, when they were not.

## IV. BENZENE WAS FOUND IN OTHER JNJ PRODUCTS BUT JNJ DID NOT TEST THE BPO PRODUCTS FOR BENZENE

59.     The contamination of consumer products, drugs, and foods with carcinogens and neurotoxins has topped headlines in recent years because of testing by concerned citizens and laboratories including Valisure. In 2020, the FDA started working with companies to identify benzene in products, which resulted in product recalls of hand sanitizers, sunscreens, and deodorants.  In 2021, an independent chemical analysis by Valisure of hundreds of sunscreens and after-sun care products from 69 brands found 27 percent of the batches had significant levels of benzene above the FDA 2 ppm limit.[33] JNJ's Aveeno and Neutrogena sunscreen lines were among the most benzene contaminated and were recalled.[34]  CVS's private brand after-sun care products were also highly contaminated with benzene, but not recalled by CVS.  By 2021, Defendants were aware of benzene contamination issues in other consumer products but continued to advertise and sell the BPO Products without testing them for benzene.

60.     JNJ's lack of transparency around carcinogens in consumer products goes back even further.  JNJ has been sued by tens of thousands of ovarian cancer victims due to JNJ's concealment of asbestos in talcum powder.  JNJ's internal documents show JNJ was aware since the late 1950s the talc used in Johnson's Baby Powder

---

[33] *See* Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products (May 24, 2021).

[34] Johnson & Johnson Consumer Inc., *Voluntarily Recall of Specific Neutrogena and Aveeno Aerosol Sunscreen Products Due to the Presence of Benzene,* (July 14, 2021).

24

CLASS ACTION FIRST AMENDED COMPLAINT

sometimes contained asbestos, known to cause health issues including cancer and mesothelioma. Instead of warning consumers about possible health risks, JNJ doubled down on aggressively marketing JNJ's talc-based baby powder to women who used the talc on themselves and their babies.  An internal JNJ memo from 1992 acknowledged the potential links to cancer, while simultaneously recommending increased marketing to African American and Hispanic women. JNJ handled out free samples in black communities and started radio ads on Hispanic stations.

## V.    DEFENDANTS IGNORED FDA'S ALERT TO TEST FOR BENZENE

61.    In 2022, the FDA issued a safety alert warning drug manufacturers of the risk of benzene contamination in certain drug products and drug components. The FDA reiterated the risk benzene exposure poses to public health and the drug manufacturers' obligations to test drug products under federal law.

62.    The FDA reminded drug manufacturers they were required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 C.F.R. §§ 211.84, 211.160). This included testing of raw materials and finished batches (21 C.F.R. § 211.165) prior to release to ensure they met appropriate specifications for identity, strength, quality, and purity.[35]

63.    The FDA warned drug manufacturers that any drug products or components at risk of benzene contamination should be tested, and any batches with benzene above 2 ppm should not be released to the public.[36]  The FDA further warned that, if any drug or drug component was subject to deterioration, drug manufacturers must have re-testing procedures in place to ensure continued purity and stability.  If any drug product in circulation was found to have benzene over 2ppm, the FDA directed that drug manufacturers contact the FDA to discuss a voluntarily recall.[37]

---

[35] U.S. Food and Drug Administration, *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* (Dec. 22, 2022).

[36] Id., 3.

[37] Id., 2.

CLASS ACTION FIRST AMENDED COMPLAINT

64.     To date, none of the Defendants' Products have been recalled due to benzene contamination, and none have voluntarily notified consumers of contamination or risk of contamination.

## VI.   RECENT TESTING FOUND BPO PRODUCTS CONTAIN DANGEROUS LEVELS OF BENZENE AND DEGRADE DURING REGULAR TRANSPORT AND HANDLING

65.     Testing by Valisure in 2023 found common acne treatment products formulated with BPO are not only contaminated with benzene but have levels dangerous to public health. Valisure is an accredited independent laboratory who has developed validated analytical methods[38] to test drugs and consumer products to address rising concerns about public safety. Valisure has tested a wide variety of drugs and products for benzene including sunscreens, antiperspirants, hand sanitizers, and dry shampoos. Their work has led to widely publicized product recalls protecting the public from dangerous and carcinogenic consumer products.[39]

66.     In 2023, Valisure tested 175 finished acne treatment products to determine whether any had benzene.  Of the 175 products tested, 99 were formulated with BPO, 58 had active ingredients (either individually or in combination) of salicylic acid, sulfur, adapalene, azelaic acid, niacinamide and zinc, and 18 had no drug ingredients.[40] 83 of the BPO Products were purchased over the counter from major retailers and 16

---

[38] Valisure's test methods largely mirror those utilized by FDA's own "Drug Quality Sampling and Testing" ("DQST") Program.  *See* Valisure FDA Citizen's Petition on BPO, at 4.

[39] Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products, (May 24, 2021), https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen); Valisure's Citizen Petition on Hand Sanitizer Products Containing Benzene Contamination (filed March 24, 2021),  https://www.regulations.gov/document/FDA-2021-P-0338-0001), Valisure's Citizen Petition on Benzene in Sunscreen and After-sun Care Products (filed May 24, 2021), https://www.regulations.gov/document/FDA-2021-P-0497-0001), Valisure's Citizen Petition on Benzene in Body Spray Products, November 3, 2021),  https://www.regulations.gov/document/FDA-2021-P-1193-0001), Valisure's Citizen Petition on Benzene in Dry Shampoo Products, (October 31, 2022).

[40] Valisure's March 5, 2024 Citizen's Petition on BPO.

CLASS ACTION FIRST AMENDED COMPLAINT

were prescription products purchased from licensed wholesalers.[41] The BPO Products included popular Defendants' BPO Products.

67.    Valisure used three incubation temperatures to evaluate the effects of common distributor and consumer use, handling, and storage conditions on benzene formation. 37°C/98.6°F was used for human body temperature, 50°C/122°F was used to evaluate shelf-life performance as an accelerated stability testing temperature used by the pharmaceutical industry, [42] and 70°C/158°F to model storage in a hot vehicle.[43] The BPO Products were incubated at 37°C for four weeks and 50°C for three weeks and benzene concentration was measured at certain time intervals using GC-MS. Benzene findings were plotted in real time and reported in parts per million ("ppm"). The results below were submitted to the FDA in Valisure's March 5, 2024 Citizen's Petition on Benzoyl Peroxide.[44]

**4A**



---

[41] *Id.·*

[42] Ghimire, Prakash et al., *Guidelines on Stability Studies of Pharmaceutical Products and Shelf-Life Estimation,* INTERNATIONAL JOURNAL OF ADVANCES IN PHARMACY AND BIOTECHNOLOGY, (2020). 06. 15-23. 10.38111/ijapb.20200601004.·

[43] Grundstein A, Meentemeyer V, Dowd J, *Maximum vehicle cabin temperatures under different meteorological conditions.* Int J Biometeorol, 2009 May;53(3):255-61. doi: 10.1007/s00484-009-0211-x. Epub 2009 Feb 21. PMID: 19234721.·

[44] Valisure, LLC, *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and Form Benzene*, (March 5, 2024), https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide.

**4B**



**4C**



**4D**



28

**4E**



**4F**



**4G**



29

CLASS ACTION FIRST AMENDED COMPLAINT

**4H**




68.    Valisure found the BPO formulated products were not chemically stable and yielded benzene at levels well over 2 ppm, the maximum amount allowed in any U.S. regulated drug.  Some of the benzene levels were eight hundred times higher than 2 ppm reaching as high as 1700 ppm.[45] The concentration of BPO in the Products did not influence the benzene levels.

69.    Valisure also found that benzene vapors leaked from some of the tested Products' packaging contaminating the surrounding air even when the packaging was closed raising concern for additional inhalation exposures.[46]  Considering the fact that benzene rapidly converts into vapor form on standing, all BPO Products appear to continually contaminate the air surrounding the product, exposing users to inhaled exposed to benzene—the primary route of exposure.

70.    Valisure concluded that all on-market BPO acne formulations are fundamentally unstable and form unacceptably high levels of benzene under normal use, handling, and storage temperatures, but no such evidence was observed for acne treatment products not formulated with BPO.[47]  The finding that additional benzene leaked into the surrounding air from the products' containers means the total consumer benzene exposure would be even more dangerous than the levels reported.

---

[45] *Id.*
[46] *Id.*
[47] *Id.*

CLASS ACTION FIRST AMENDED COMPLAINT

71.     Valisure filed a Citizen's Petition on Benzoyl Peroxide on March 5, 2024[48] with the FDA requesting the FDA Commissioner to immediately demand a recall of all BPO Products formulated with BPO and further to require that drug manufacturers do independent chemical verification.

72.     Valisure's testing has been peer-reviewed and published in the prestigious journal Environmental Health Perspectives.  Thus, this testing has been validated by the medical and scientific community.

## VII.  DEFENDANTS EXPOSED CONSUMERS TO A RISK OF BENZENE EXPOSURE WITHOUT THEIR KNOWLEDGE

73.     Although benzene has been found in on-market BPO Products and released into the surrounding air from the certain Products' packaging, Defendants did not list benzene among the BPO Products' ingredients, on the Products' label or container, or anywhere in advertising or on websites. Defendants did not warn that the Products contain benzene, are at risk of benzene contamination, or that the Products could cause consumers to be exposed to benzene even when the container and packaging is sealed.

74.     Benzene is a carcinogen that has been among the most studied toxins over the last hundred years due to its wide use during the industrial revolution, extreme danger, and known ability to cause cancer and death in humans and animals. The medical literature linking benzene to blood cancers is vast dating to the 1930s.[49] Benzene is the foundation component for many chemicals used to make plastics, resins, synthetic fibers, paints, dyes, detergents, drugs, and pesticides. In the past, benzene was widely used as a solvent in industrial paints, paint removers, adhesives, degreasing agents, denatured alcohol, and rubber cements. Benzene use has declined due to the

---

[48] As of the date of filing this Class Action, Valisure's FDA BPO Petition is still pending.
[49] Hamilton A., *Benzene (benzol) poisoning*, ARCH PATHOL, 434-54, 601-37 (1931); Hunter FT, *Chronic exposure to benzene (benzol). Part 2:  The clinical effects*, 21 J. IND. HYG TOXICOL 8, 331-54 (1939); Mallory TB, et al., *Chronic exposure to benzene (benzol). Part 3: The pathological results,* 21 J. IND. HYG TOXICOL 8, 355-93 (1939); Erf, L.A., and Rhoads C.P., *The hematological effects of benzene (benzol) poisoning.*, 21 J. IND. HYG TOXICOL 8, 421-35 (1939).

proliferation of worker studies and an ever-growing body of evidence confirming benzene's contribution to blood cancers.

75.     Benzene has no known safe level of exposure.[50] Benzene causes central nervous system depression and destroys bone marrow, leading to injury in the hematopoietic system.[51] Thus, even if benzene exposure does not ultimately lead to cancer development, any exposure causes physical harm to a human.  The International Agency for Research on Cancer ("IARC") classifies benzene as a "Group 1 Carcinogen" that causes cancer in humans, including acute myelogenous leukemia ("AML").[52]  AML is the signature disease for benzene exposure with rates of AML particularly high in studies of workers exposed to benzene.[53]

76.     Benzene exposure is cumulative and additive. There is no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[54]

77.     The Agency for Toxic Substances and Disease Registry's ("ATSDR") "Tox Facts" for benzene warns that people can be exposed to benzene vapors from benzene-containing products and that benzene harms the blood marrow, causing leukemia and anemia, and affects the immune system leaving victims vulnerable to infection.[55]

78.     According to the FDA, benzene in small amounts over long periods of time can decrease the formation of blood cells and long-term exposure through inhalation,

[50] Harrison R, Saborit, J., *WHO Guidelines for Indoor Air Quality – Selected Pollutants,* (2010); see also Smith, M. T., *Advances in Understanding Benzene Health Effects and Susceptibility,* 31 ANNUAL R. OF PUB. HEALTH., 133-148 (2010).

[51] U.S. Food and Drug Administration, *Toxicological Data for Class 1 Solvents, Appendix 4, Benzene,* https://www.fda.gov/media/71738/download.·

[52] International Agency for Research on Cancer. Benzene, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 120,* World Health Organization, (2018).

[53] American Cancer Association, *Benzene and Cancer Risk,* https://www.cancer.org/cancer/risk-prevention/chemicals/benzene.html (last visited October 20, 2023)·

[54] Smith, M. T., *Advances in Understanding Benzene Health Effects and Susceptibility,*  31 ANNUAL R. OF PUB. HEALTH., 133-148 (2010).

[55] Agency for Toxic Substances and Disease Registry, Benzene – Tox Facts, CAS # 71-43-2.

CLASS ACTION FIRST AMENDED COMPLAINT

oral intake, and skin absorption may result in cancers such as leukemia and other blood disorders.[56] The FDA recognizes benzene as carcinogen that can cause cancer in humans[57] and classifies it as a "Class 1" solvent that must be "avoided" in drug manufacturing.[58]

79.   IIn July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson.[59] The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm," which "levels exceed the guideline value provided by ICH [Q3C][60] and USP[61]" limits, states the report. The evaluation concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment of a body function" were "likely to occur" at exposure levels within that range. In addition, the evaluation stated that "individuals with altered skin absorption (i.e., infants, elderly, broken skin) and individuals who are exposed to benzene from other sources . . . may be at greater risk."

80.   The Environmental Protection Agency ("EPA") similarly recognizes the cancer risks of benzene, noting that "Benzene is classified as a 'known' human

---

[56] U.S. Federal Drug Administration, *Frequently Asked Questions on Benzene Contamination in Drugs,* (December 27, 2023), https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.

[57] U.S. Food and Drug Administration, *Questions and Answers on the Occurrence of Benzene in Soft Drinks and Other Beverages,* (Feb. 25, 2022), https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages

[58] U.S. Food and Drug Administration, *Q3C – Tables and Lists Guidance for Industry,* https://www.fda.gov/media/71737/download (last visited September 26, 2023).

[59] Consumer Reports, *Benzene in Sunscreen Assessment,* (December 12, 2021), https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

[60] The term "ICH" refers to The International Conference on Harmonization (ICH) Q3C Impurities: Residual Solvents guidance (December 1997). https://www.fda.gov/media/71736/download?attachment.

[61] The term "USP" refers to United States Pharmacopeia (USP) Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.

CLASS ACTION FIRST AMENDED COMPLAINT

carcinogen (Category A) under the Risk Assessment Guidelines of 1986."[62] "[B]enzene is characterized as a known human carcinogen for all routes of exposure based on convincing human evidence as well as supporting evidence from animal studies."[63]

81.    EPA has set 0.0005 ppm as the maximum permissible level of benzene in drinking water, with a stated goal of "zero."[64]

82.    In its review of non-cancer adverse health effects of benzene, the EPA cited epidemiologic evidence that "support a threshold of benzene Hematotoxicity[65] in humans in the 5-19 ppm range[.]"[66]  As noted in the EPA's review, "[c]learly, if a significantly elevated risk of benzene poisoning is an indication of hematotoxicity, then certainly exposures to benzene at 5-19 ppm are hematotoxic."[67]

83.    "Even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[68]

84.    As with other topically applied products, the application of BPO Products specifically increases the absorption rate of benzene through the skin, thereby increasing the risk of harm.[69]  Indeed, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[70]

---

[62] U.S. Environmental Protection Agency, Toxicological Review of Benzene, (October 2022), https://cfpub.epa.gov/ncea/iris2/chemicallanding.cfm?substance_nmbr=276.

[63] Id.

[64] U.S. Environmental Protection Agency, National Primary Drinking Water Regulations, (May 2009), https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations.

[65] The term "hematotoxic" means "poisonous to the blood and to the organs and tissues involved in the production of blood, such as the bone marrow." https://clinicalinfo.hiv.gov/en/glossary/hematotoxic.

[66] U.S. Environmental Protection Agency, Toxicological Review of Benzene (Noncancer Effects) (October 2002), at 38.

[67] Id.

[68] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, 130 ENV. HEALTH PERSPECTIVES 3, 037701-1–4 (2022).

[69] Valisure, LLC., Valisure Detects Benzene in Sunscreen, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen.

[70] Center for Disease Control and Prevention, Facts About Benzene, (April 4, 2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

CLASS ACTION FIRST AMENDED COMPLAINT

85.     Benzene is a major industrial chemical made from coal and oil that is heavily regulated by the EPA as an important environmental pollutant that negatively affects the soil, air, and groundwater. Waste and air emissions containing benzene are considered hazardous waste. The coal, oil, paint, and chemical industries are heavily regulated due to the emission of carcinogens including benzene from refining and other industries processes involving benzene and benzene byproducts, which can end up in the air, water, and food supply.

86.     Benzene is heavily regulated to protect public health and should not be in drug products, especially ones such as acne treatment that are used daily by children and teenagers for many years. The FDA drug guidelines specify that benzene must not be used to make drugs products because of the unacceptable toxicity and deleterious environmental effects.[71]  The FDA allows one limited exception – where the use of benzene in a drug product is unavoidable to produce a drug product with a significant therapeutic advance. In that instance, benzene must be restricted to two parts per million (ppm).[72]  Defendants' BPO Products do not meet this rare exception.

87.     Benzene is heavily regulated in the workplace. The U.S. Occupational Safety and Health Administration ("OSHA") set an eight-hour exposure standard of 1 ppm.[73]  The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[74] Exposure

---

[71] U.S. Food and Drug Administration, *Q3C – Tables and Lists Guidance for Industry,* https://www.fda.gov/media/71737/download (last visited September 26, 2023).

[72] *Id.*

[73] Occupational Safety and Health Administration (OSHA), *Occupational exposure to benzene:  Final rule.* Fed. Reg. 1987;52-34460-578.

[74] The National Institute For Occupational Safety And Health, *NIOSH Pocket Guide to Chemical Hazards - Benzene,* (September 2007), https://www.cdc.gov/niosh/npg/npgd0049.html.

35

CLASS ACTION FIRST AMENDED COMPLAINT

studies known as the "China studies" confirmed cancer at levels below 1 ppm.[75]  The benzene levels created from Defendants' BPO Products are many times higher than the levels reported in these worker studies and the acceptable limits set by regulators. Benzene can also pass from the mother's blood to a developing fetus causing the baby to be exposed to benzene.[76] Animal studies have shown low birth weights, delayed bone formation, and damage to the bone marrow of developing offspring when pregnant animals breathed benzene.[77]

88.     Plaintiffs and the Class members were exposed to benzene from the BPO Products by inhalation and dermal absorption.  Benzene can be absorbed into the body via inhalation, skin absorption, ingestion, and/or eye contact.[78] Plaintiffs and the Classes applied the BPO Products to areas of the skin including the face, neck, chest, and back one to three times per day and used the BPO Products as washes or scrubs in heated showers.  Plaintiffs and the putative Class members also inhaled benzene leaked from contaminated BPO Products.

## VIII. DEFENDANTS DIRECTLY MARKETED THE BPO PRODUCTS TO CHILDREN AND TEENAGERS WITHOUT DISCLOSING THE RISK OF BENZENE CONTAMINATION

89.     Defendants' BPO Products are widely used by children and teenagers as a standalone treatment or in combination with other BPO Products. Defendants knew that adolescents are the largest users with users as young as 7-10 years old. Defendants recommended that consumers, including children, use the BPO Products one to three times a day, over many months or longer for persistent acne. Defendants knew that

---

[75] See Lan Q, Zhang L et al., *Hematotoxicity in Workers Exposed to Low Levels of Benzene,* SCIENCE, (December 3, 2004); Costa-Amaral I, V. B. L., *Environmental Assessment and Evaluation of Oxidative Stress and Genotoxicity Biomarkers Related to Chronic Occupational Exposure to Benzene,* 16 INT J ENVIRON RES PUBLIC HEALTH 12, 2240 (2019).

[76] *Id.*

[77] *Id.*

[78] The National Institute For Occupational Safety And Health, *NIOSH Pocket Guide to Chemical Hazards - Benzene,* (September 2007), https://www.cdc.gov/niosh/npg/npgd0049.html.

CLASS ACTION FIRST AMENDED COMPLAINT

1  some consumers would use the BPO Products for many years starting in their teens.

2  There is no cure for acne. Defendants knew that consumers with chronic acne would

3  use BPO Products several times a day throughout their lifetime.

4      90.    Defendants aggressively marketed the BPO Products directly to children

5  and teenagers when they knew, or should have known, the BPO Products degrade to

6  benzene under normal use and storage conditions. Many of Defendants' internet and

7  print advertisements featured children, teenagers, eye-catching props, music, and colors

8  meant to attract teens and pre-teens, and appeal to their preferences, activities, and

9  interests.

10      91.    Defendants marketing of BPO Products without mentioning benzene, the

11  risk of benzene exposure, or testing for benzene was misleading, fraudulent, deceptive,

12  and dangerous.

13  **IX.  PUNITIVE DAMAGES ALLEGATIONS**

14      92.    Defendants' conduct was done with malice and reckless disregard for

15  human life.  Defendants knew the BPO Products degraded to benzene when exposed to

16  normal consumer use, handling, and storage conditions. Defendants further knew that

17  benzene is a known human carcinogen that is not supposed to be in the BPO Products

18  due to the grave risk of harm to consumers.  Defendants disregarded this information

19  and the known risks of benzene exposure and deliberately omitted benzene from the list

20  of ingredients, the BPO Products' labels, and social media and websites where

21  information about the BPO Products is found.  Defendants consciously and deliberately

22  crafted the BPO Products' marketing, labels, packaging, containers, and warnings

23  intending to mislead consumers and lead them to believe the BPO Products were safe

24  and carcinogen-free.

25      93.    Defendants marketed themselves as expert drug formulators, researchers,

26  and sellers skilled in developing safe and reliable products.  Defendants withheld

27  material health and safety information Defendants knew was essential to informed

28

consumer decision making. Defendants knew that, by their conduct, they were robbing consumers and the public of their right to choose safe products.

94.    Defendants were on notice of benzene findings in other consumer and drug products leading to widely publicized recalls.  Defendants were on notice of the FDA's concerns of benzene contamination in drug and consumer products and received the FDA's 2022 directive to test products for benzene contamination.  Defendants disregarded these notices and continued to market and sell the BPO Products without testing them for benzene.

95.    Defendants knew their decisions and chosen course of conduct was risky and would cause consumers to be exposed to benzene. Defendants' conduct was not by accident, but was deliberate, calculated, and informed.  Defendants knew they could sell more BPO Products and earn more money by concealing material human health and safety information. Defendants further knew that testing the BPO Products for benzene would yield findings of benzene requiring recalls and/or a shutdown of production causing significant losses of income.  Defendants' goals were met not only because of the false and deceptive advertising, labeling, and packaging, but through a comprehensive scheme of aggressive marketing and image branding leading consumers to believe they were acne treatment experts dedicated to drug research, development, and safety and using only the safest ingredients and formulations that would remain pure and stable until the designated end, i.e., the expiration date.  Defendants' conduct and concealment of material health and safety information was done to further their own monetary gain and with conscious disregard of the Consumers, and the public's right to choose safe products. Defendants' conduct was intentional, calculated, blatantly deceptive, unscrupulous, and offensive to consumer health and public policy. To redress the harm caused by Defendants' conduct, Plaintiffs, on behalf themselves, the Class, and Subclasses, seek punitive damages against the Defendants.

## X.    PLAINTIFF-SPECIFIC ALLEGATIONS

96.    Plaintiff Alan Montenegro is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene.  In shopping for drug products for his skin and face, Plaintiff Alan Montenegro was particularly concerned about the product being cost effective, that the BPO Product received positive reviews from verified buyers, and the before and after images for use of the Product.  Plaintiff recalls seeing online advertisements by Defendants before purchasing them in the store.  Based on the statements made by Defendants, JNJ's widely recognized name, and lack of information that the BPO Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

97.    Plaintiff Montenegro bought Neutrogena Rapid Clear Stubborn Acne Spot Gel and used it from 2017 to 2021 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes.  The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed.  Plaintiff was unaware when he bought a BPO Product that it was contaminated with benzene or that it could degrade to benzene.  Had Defendants been truthful and told Plaintiff he would be exposed to benzene; he would not have purchased Neutrogena Rapid Clear Stubborn Acne Spot Gel.

98.    Plaintiff Montenegro suffered an ascertainable economic loss because of Defendants statements and misrepresentations in that he bought the BPO Products he would not have bought but for Defendants statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

99.    Plaintiff Melissa Medina is a Nevada resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens

CLASS ACTION FIRST AMENDED COMPLAINT

such as benzene. In shopping for drug products for her skin and face, Plaintiff Melissa Medina was particularly concerned about a product that was effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, widely recognized name, and lack of information that the BPO Products contained carcinogens such as benzene, Plaintiff believed the BPO Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

100.   Plaintiff Medina bought Clean & Clear Continuous Control Acne Cleanser and used it from September 2020 to May 2023 for her breakouts on her skin and face. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the BPO Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene; she would not have purchased Clean & Clear Continuous Control Acne Cleanser.

101.   Plaintiff Medina suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the BPO Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

102.   Plaintiff Brenda Morgan is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Brenda Morgan was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants.

CLASS ACTION FIRST AMENDED COMPLAINT

Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

103.  Plaintiff Morgan bought Neutrogena Rapid Clear Stubborn Acne Spot Gel, J&J's Persa-Gel® 10, and Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash and used it from 1980 to 2020 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene, she would not have purchased Neutrogena Rapid Clear Stubborn Acne Spot Gel, J&J's Persa-Gel® 10, and Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash.

104.  Plaintiff Morgan suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

105.  Plaintiff Cheryl Powers is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Cheryl Powers was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack

CLASS ACTION FIRST AMENDED COMPLAINT

of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

106.   Plaintiff Powers bought Neutrogena Rapid Clear Stubborn Acne Spot Gel and used it from 2012 to 2022 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene; she would not have purchased Neutrogena Rapid Clear Stubborn Acne Spot Gel.

107.   Plaintiff Powers suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

108.   Plaintiff Jenny Qu is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Jenny Qu was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

CLASS ACTION FIRST AMENDED COMPLAINT

109.  Plaintiff Qu bought Neutrogena Rapid Clear Stubborn Acne Spot Gel and used it from July 2023 to October 2023 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene; she would not have purchased Neutrogena Rapid Clear Stubborn Acne Spot Gel.

110.  Plaintiff Qu suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

111.  Plaintiff Daniel Feldtkeller is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for his skin and face, Plaintiff Daniel Feldkeller was particularly concerned about the product being effective and safe to use to help with the breakouts on his skin and face. Plaintiff read the front labeling of the product which encouraged him to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

112.  Plaintiff Feldtkeller bought Neutrogena Rapid Clear Stubborn Acne Spot Gel and used it from December 2006 to March 2024 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by

43

Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when he bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff he would be exposed to benzene; he would not have purchased Neutrogena Rapid Clear Stubborn Acne Spot Gel.

113.   Plaintiff Feldtkeller suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that he bought the Products he would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

114.   Plaintiff Leslie LaMay is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Leslie LaMay was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

115.   Plaintiff LaMay bought Neutrogena Stubborn Acne AM Treatment and used it from April 2021 to April 2024 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told

44

1  Plaintiff she would be exposed to benzene; she would not have purchased Neutrogena
2  Stubborn Acne AM Treatment.

3      116.  Plaintiff LaMay suffered an ascertainable economic loss because of
4  Defendants' statements and misrepresentations in that she bought the Products she
5  would not have bought but for Defendants' statements and misrepresentations.
6  Furthermore, Plaintiff ultimately purchased a product that was not what it purported to
7  be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus,
8  illegal for sale within the United States, and the product possessed less value than the
9  money spent on the product.

10      117.  Plaintiff Kayleigh Schneider is a Connecticut resident who places a high
11  priority on health and safety, and on the adverse health consequences of exposure to
12  carcinogens such as benzene. In shopping for drug products for her skin and face,
13  Plaintiff Kayleigh Schneider was particularly concerned about the product being
14  effective and safe to use to help with the breakouts on her skin and face. Plaintiff read
15  the front labeling of the product which encouraged her to purchase the product by
16  Defendants. Based on the statements made by Defendants, their widely recognized
17  name, and lack of information that the Products contained carcinogens such as benzene,
18  Plaintiff believed the Products were safe to put on her skin. Defendants' representations
19  and omissions of human health and safety information were material to Plaintiff.

20      118.  Plaintiff Schneider bought Johnson & Johnson's Persa-Gel® 10 and used it
21  from 2021 to April 2024 in hopes of creating a daily skin routine and getting rid of acne
22  spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and
23  degraded into benzene when stored and used as instructed. Plaintiff was unaware when
24  she bought the Product that it was contaminated with benzene or that it could degrade
25  to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to
26  benzene; she would not have purchased Johnson & Johnson's Persa-Gel® 10.

27      119.  Plaintiff Schneider suffered an ascertainable economic loss because of
28  Defendants' statements and misrepresentations in that she bought the Products she

would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

120.   Plaintiff Verunika Dujmovic is an Illinois resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Verunika Dujmovic was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

121.   Plaintiff Dujmovic bought Neutrogena Rapid Clear Stubborn Acne Spot Gel, Neutrogena Stubborn Acne AM Treatment and Neutrogena Stubborn Marks PM Treatment and used it from 2015 to April 2024 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene, she would not have purchased Neutrogena Rapid Clear Stubborn Acne Spot Gel, Neutrogena Stubborn Acne AM Treatment and Neutrogena Stubborn Marks PM Treatment.

122.   Plaintiff Dujmovic suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations.

Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

123.  Plaintiff Abdallah Al-Qudsi is an Illinois resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Abdallah Al-Qudsi was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

124.  Plaintiff Al-Qudsi bought Neutrogena Rapid Clear Stubborn Acne Spot Gel and used it from April 2009 to April 2023 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene, she would not have purchased Neutrogena Rapid Clear Stubborn Acne Spot Gel, Neutrogena Stubborn Acne AM Treatment and Neutrogena Stubborn Marks PM Treatment.

125.  Plaintiff Al-Qudsi suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus,

47
CLASS ACTION FIRST AMENDED COMPLAINT

illegal for sale within the United States, and the product possessed less value than the money spent on the product.

126.   Plaintiff Marilyn Saavedra is a Maryland resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Marilyn Saavedra was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

127.   Plaintiff Saavedra bought Johnson & Johnson Persa-Gel® 10, Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, and Neutrogena Rapid Clear Stubborn Acne Spot Gel and used it from September 2018 to April 2022 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene, she would not have purchased Johnson & Johnson Persa-Gel® 10, Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, and Neutrogena Rapid Clear Stubborn Acne Spot Gel.

128.   Plaintiff Saavedra suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus,

48

1 illegal for sale within the United States, and the product possessed less value than the
2 money spent on the product.

3   129.  Plaintiff Johne Conte is a New York resident who places a high priority on
4 health and safety, and on the adverse health consequences of exposure to carcinogens
5 such as benzene. In shopping for drug products for his skin and face, Plaintiff Johne
6 Conte was particularly concerned about the product being effective and safe to use to
7 help with the breakouts on his skin and face. Plaintiff read the front labeling of the
8 product which encouraged him to purchase the product by Defendants. Based on the
9 statements made by Defendants, their widely recognized name, and lack of information
10 that the Products contained carcinogens such as benzene, Plaintiff believed the Products
11 were safe to put on his skin. Defendants' representations and omissions of human
12 health and safety information were material to Plaintiff.

13   130.  Plaintiff Conte bought Neutrogena On-the-Spot Acne Treatment and used
14 it from August 2018 to March 2024 in hopes of creating a daily skin routine and getting
15 rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained
16 benzene and degraded into benzene when stored and used as instructed. Plaintiff was
17 unaware when he bought the Product that it was contaminated with benzene or that it
18 could degrade to benzene. Had Defendants been truthful and told Plaintiff he would be
19 exposed to benzene; he would not have purchased Neutrogena On-the-Spot Acne
20 Treatment.

21   131.  Plaintiff Conte suffered an ascertainable economic loss because of
22 Defendants' statements and misrepresentations in that he bought the Products he would
23 not have bought but for Defendants' statements and misrepresentations. Furthermore,
24 Plaintiff ultimately purchased a product that was not what it purported to be, was unfit
25 for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale
26 within the United States, and the product possessed less value than the money spent on
27 the product.

28

CLASS ACTION FIRST AMENDED COMPLAINT

132.   Plaintiff Starnella Harder is an Ohio resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Starnella Harder was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

133.   Plaintiff Harder bought Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash and used it from September 2021 to 2023 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene, she would not have purchased Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash.

134.   Plaintiff Harder suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

135.   Plaintiff Alexandra Donato is a Pennsylvania resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face,

50

**CLASS ACTION FIRST AMENDED COMPLAINT**

Plaintiff Alexandra Donato was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

136.  Plaintiff Donato bought Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, Neutrogena Rapid Clear Stubborn Acne Spot Gel, and Neutrogena Stubborn Acne AM Treatment and used it from 2021 to 2023 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene, she would not have purchased Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, Neutrogena Rapid Clear Stubborn Acne Spot Gel, and Neutrogena Stubborn Acne AM Treatment.

137.  Plaintiff Donato suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

138.  Plaintiff Joseph Long is a Washington resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for his skin and face,

CLASS ACTION FIRST AMENDED COMPLAINT

Plaintiff Joseph Long was particularly concerned about the product being effective and safe to use to help with the breakouts on his skin and face. Plaintiff read the front labeling of the product which encouraged him to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

139. Plaintiff Long bought Johnson & Johnson's Persa-Gel® and used it from March 2023 to March 2024 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when he bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff he would be exposed to benzene; he would not have purchased Johnson & Johnson's Persa-Gel®.

140. Plaintiff Long suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that he bought the Products he would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

141. Plaintiff Noah Long is a Washington resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for his skin and face, Plaintiff Joseph Long was particularly concerned about the product being effective and safe to use to help with the breakouts on his skin and face. Plaintiff read the front labeling of the product which encouraged him to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information

52

CLASS ACTION FIRST AMENDED COMPLAINT

that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

142.   Plaintiff Long bought Johnson & Johnson's Persa-Gel® and used it from March 2023 to March 2024 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when he bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff he would be exposed to benzene; he would not have purchased Johnson & Johnson's Persa-Gel®.

143.   Plaintiff Long suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that he bought the Products he would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

144.   Plaintiff Robin Corey is a Washington resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Robin Corey was particularly concerned about the product being effective and safe to use to help with the breakouts on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

CLASS ACTION FIRST AMENDED COMPLAINT

145.  Plaintiff Corey bought Neutrogena Rapid Clear Stubborn Ace Spot Gel and used it from July 2018 to February 2024 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when she bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene; she would not have purchased Neutrogena Rapid Clear Stubborn Ace Spot Gel.

146.  Plaintiff Corey suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that she bought the Products she would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

147.  Plaintiff Daniel Calzado is a New York resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for his skin and face, Plaintiff Daniel Calzado was particularly concerned about the product being effective and safe to use to help with the breakouts on his skin and face. Plaintiff read the front labeling of the product which encouraged him to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained carcinogens such as benzene, Plaintiff believed the Products were safe to put on his skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

148.  Plaintiff Calzado bought Neutrogena Rapid Clear Stubborn Ace Spot Gel and used it from May 2022 to May 2024 in hopes of creating a daily skin routine and getting rid of acne spots and blemishes. The BPO Products purchased by Plaintiff

contained benzene and degraded into benzene when stored and used as instructed. Plaintiff was unaware when he bought the Product that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff he would be exposed to benzene, he would not have purchased Neutrogena Rapid Clear Stubborn Ace Spot Gel.

149.   Plaintiff Calzado suffered an ascertainable economic loss because of Defendants' statements and misrepresentations in that he bought the Products he would not have bought but for Defendants' statements and misrepresentations. Furthermore, Plaintiff ultimately purchased a product that was not what it purported to be, was unfit for human use, i.e., worthless, was adulterated and misbranded and, thus, illegal for sale within the United States, and the product possessed less value than the money spent on the product.

## XI.   CLASS ACTION ALLEGATIONS

150.   Plaintiffs bring this case on behalf of themselves, and all others similarly situated as a Class Action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent a National Class of consumers who bought the Products, and State Subclasses of consumers from the states identified below. Excluded from this Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and affiliated companies; Class counsel and their employees; and judicial officers and their immediate families as court staff assigned to the case.

151.   The Class does not seek damages for physical injuries, although Plaintiffs were physically harmed by being exposed to benzene.

152.   The Class will include a National Class to include all persons who bought for use, and not resale, the BPO Products within the United States.

153.   The State Subclasses will include all persons who bought for use, and not resale, the BPO Products within California, Connecticut, Hawaii, Illinois, Maryland,

CLASS ACTION FIRST AMENDED COMPLAINT

Massachusetts, Missouri, New York, Nevada, Ohio, Pennsylvania, Rhode Island, and Washington.

154.  This action has been brought and may be properly maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest and the proposed Class meets the class action requirements under Rule 23 of numerosity, commonality, typicality, and adequacy of representation.

155.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves, and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved.

156.  **Numerosity.** Plaintiffs believes there are millions of Class members throughout the United States, and there are tens of thousands of Subclass members in each of the listed states, making the Class and state Subclasses so numerous and geographically dispersed that joinder of all members is inconvenient and impracticable.

157.  **Commonality.** There are questions of law and fact common to all Class members that predominate over questions which affect only individual Class members. All Class members were deceived and misled by Defendants through the same advertising, online representations, labeling, and packaging, which did not mention benzene, and which misrepresented the characteristics, ingredients, and safety of the BPO Products. All Class members bought Defendants' BPO Products and have suffered an economic loss because of Defendants' deceptions and omissions of material health and safety information. Thus, there is a well-defined community of interest in the questions of law and facts common to all Class members. Other common questions of law and fact in this dispute include, without limitation:

   a.  Whether Defendants' BPO Products degrade to benzene under common distributor and consumer handling, use, and storage conditions.

   b.  Whether Defendants tested the BPO Products for benzene before selling

CLASS ACTION FIRST AMENDED COMPLAINT

1    them to Plaintiffs, the Class, and the public.

2    c.  When Defendants knew or should have known the BPO Products degraded

3        to benzene.

4    d.  When Defendants knew or should have known the BPO Products contain

5        benzene.

6    e.  Whether Defendants' advertising omitting benzene was deceptive,

7        fraudulent, or unfair.

8    f.  Whether Defendants' advertising omitting benzene was likely to deceive

9        reasonable consumers.

10   g.  Whether Defendants' conduct violated California's Unfair Competition

11       Law, Bus. & Prof. Code § 17200 *et seq.*

12   h.  Whether Defendants' conduct violated California consumer protection laws.

13   i.  Whether Defendants conduct violated Connecticut consumer protection

14       laws.

15   j.  Whether Defendants conduct violated Hawaii consumer protection laws.

16   k.  Whether Defendants conduct violated Illinois consumer protection laws.

17   l.  Whether Defendants conduct violated Massachusetts consumer protection

18       laws including Mass. Gen. Laws Ann. Ch. 93A, § 1 *et seq.*

19   m.  Whether Defendants conduct violated Maryland consumer protection laws.

20   n.  Whether Defendants conduct violated Missouri consumer protection laws

21       including Mo. Rev. Stat. § 407, *et seq.*

22   o.  Whether Defendants conduct violated Nevada consumer protection laws

23       including Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52,

24       Chapter 598 *et seq*.

25   p.  Whether Defendants conduct violated New York consumer protection laws

26       including New York Deceptive Trade Practices Law, NY Gen. Bus. §349(a)

27       and NY Gen. Bus. §§ 350 *et seq.*

28   q.  Whether Defendants conduct violated Pennsylvania consumer protection

57

**CLASS ACTION FIRST AMENDED COMPLAINT**

1  laws.

2  r.  Whether Defendants conduct violated Ohio consumer protection laws.

3  s.  Whether Defendants conduct violated Rhode Island consumer protection

4  laws.

5  t.  Whether Defendants conduct violated Washington's consumer protection

6  laws.

7  u.  Whether Defendants breached the express and implied warranties they made

8  about the BPO Products.

9  v.  Whether Defendants were unjustly enriched by the Plaintiffs and the Class

10  members purchase of the BPO Products.

11  w.  Whether the Plaintiffs and the Class members have been injured and if so,

12  what is the proper measure of damages.

13  x.  Whether the Plaintiffs and the Class members have the right to economic

14  damages including compensatory, exemplary, and statutory remedies for

15  Defendants misconduct.

16  y.  Whether the Plaintiffs and the Class members have the right to injunctive,

17  declaratory, or other equitable relief and attorneys' fees.

18  158.  **Typicality.** Plaintiffs' claims are typical of the claims of the Class because

19  the claims arise from the same course of misconduct by Defendants, i.e., Defendants

20  false and misleading advertising and the failure to disclosure benzene in the Products.

21  The Plaintiffs, and all Class members were all exposed to the same uniform and

22  consistent advertising, labeling, and packaging statements Defendants made about the

23  Products. Because of the Defendants' misconduct, Plaintiffs, like all Class members,

24  were damaged and have incurred economic losses because they bought the Products

25  believing they were safe. The claims of the Plaintiffs are typical of all Class members.

26  159.  **Adequacy.**  The Plaintiffs will fairly and adequately represent and protect

27  the interests of all Class members. Plaintiffs have no interests antagonistic to the Class

28  members. Plaintiffs hired attorneys experienced in the prosecution of consumer Class

58

1   Actions and Plaintiffs intend to prosecute this action vigorously. Plaintiffs anticipate no

2   difficulty in the management of this litigation as a Class Action.

3        160.   Finally, this Class Action is proper under Rule 23(b) because, under these

4   facts, a Class Action is superior to other methods and is the most efficient method for

5   the fair and efficient adjudication of the dispute. The Class members have all suffered

6   economic damages because of Defendants' deceptive trade practices, false advertising,

7   and omissions of material health and safety information. Because of the nature of the

8   individual Class members' claims and the cost of the Products, few, if any individuals,

9   would seek legal redress against Defendants because the costs of litigation would far

10  exceed any potential economic recovery. Absent a Class Action, individuals will

11  continue to suffer economic losses for which they would have no remedy, and

12  Defendants will unjustly continue their misconduct with no accountability while

13  retaining the profits of their ill-gotten gains. Even if separate cases could be brought by

14  individuals, the resulting multiplicity of lawsuits would cause undue hardship, burden,

15  and expense for the Court and the litigants, as well as create a risk of inconsistent

16  rulings across the country, which might be dispositive of the interests of individuals

17  who are not parties. A Class Action furthers the important public interest of containing

18  legal expenses, efficiently resolving many claims with common facts in a single forum

19  simultaneously, and without unnecessary duplication of effort and drain on critical

20  judicial resources. The Class Action method presents far fewer management difficulties

21  than individual cases filed nationwide and provides the benefit of comprehensive

22  supervision by a single court.

### XII.  CAUSES OF ACTION

**A.     VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**BUS. & PROF. CODE § 17200 *et seq.*, *Individually and on Behalf of the***
***California Subclass***

     161.   Plaintiffs reallege and incorporates all other paragraphs in this Class Action

Complaint.

CLASS ACTION FIRST AMENDED COMPLAINT

162. Plaintiffs bring this cause of action on behalf of themselves, and all members of the California Subclass, all of whom are similarly situated consumers.

163. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.,* prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising."  Defendants misrepresented their BPO Products in advertising, labels, and containers and misled Plaintiffs, the Subclass, and the public about the ingredients, characteristics, purity, quality, approval, and safety of the Products. Defendants led Plaintiffs and the California Subclass to believe the Products were safe.

164. Defendants' advertising, online representations, labeling, and packaging of the Products were misleading, fraudulent, and deceptive. Defendants knew through the Products' development, formulation, research, and pre-sale safety and stability testing, the Products were not chemically and physically stable when exposed to common temperature conditions. Defendants knew or should have known the Products formulated benzene under normal and expected consumer use, handling, and storage conditions, and that consumers would be exposed to benzene. Defendants were specifically reminded by the FDA of the obligation to ensure the safety and quality of BPO Products, including testing them for benzene before selling them to the public, but shirked their duties and continued to market and sell the BPO Products without substantiating their safety, or warning Plaintiffs and the California Subclass about benzene.

165. Defendants omitted material health and safety information, *e.g.,* benzene, from the Products' advertising, label, container, and warnings. Defendants did not tell Plaintiffs and the California Subclass they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' container closed.

166. Defendants' acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about all ingredients

CLASS ACTION FIRST AMENDED COMPLAINT

in Products. Reasonable consumers further expect that carcinogens in the Products be disclosed. Reasonable consumers further expect that on market drugs to be free of carcinogens, unless told otherwise. Benzene in a widely marketed drug product used by children, teens, and the public is material health information reasonable consumers expect to be told.

167.  Had Defendants been truthful in advertising, labeling, packaging, and online statements about benzene in the Products, or the risk of contamination, and the risk of cancer, Plaintiffs and the Class members would not have bought the Products.

168.  Defendants' acts, omissions, and concealment of material health and safety information are ongoing and continuing to cause harm. Defendants continued to market, advertise, and sell the Products to the public without telling the public about benzene in the Products, or the risk of contamination, and the risk of cancer. Defendants continued to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not tested the Products for benzene or quantified the levels of benzene formed in the Products during normal and expected storage conditions.

169.  Defendants engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the California Subclass and not outweighed by any benefit. Omitting and concealing material human health and safety information such as benzene in the Product and the consumers' risk of cancer from the Products is unethical, unscrupulous, and offensive.

170.  Plaintiffs suffered ascertainable economic losses because of Defendants misconduct because they bought the Products, they otherwise would not have bought but for Defendants misrepresentations and affirmations of safety.

171.  Because of Defendants misconduct, Plaintiffs, on behalf of themselves, and the California Subclass, seek recovery of their economic damages, attorneys' fees, restitution, and all other relief allowable under CAL. BUS. & PROF. CODE § 17200, *et seq.,* including an injunction to enjoin Defendants from continuing their fraudulent and

61

CLASS ACTION FIRST AMENDED COMPLAINT

deceptive business practices. The damages sought are ascertainable, uniform and can be measured and returned to the Plaintiffs and the California Subclass members.

**B.      VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, et seq., Individually and on Behalf of the California Subclass**

172.   Plaintiffs reallege and incorporates all other paragraphs in this Class Action Complaint:

173.   Plaintiffs bring this cause of action on behalf of themselves, and all Class California Subclass members, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

174.   Defendants' acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.,* enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendants. Other Defendants regularly transact business in California, including in this District, and have engaged in misconduct that has and had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

175.   California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq. prohibits* unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods. Defendants violated several prohibitions of CIV. CODE § 1750(a).

176.   Defendants violated CAL. CIV. CODE § 1750(a)(2) by representing the source, sponsorship, and approval, of the Products, *e.g.,* the BPO Products were backed by sound scientific principles, that Defendants met their obligations to conduct adequate and meaningful quality and safety testing before selling the BPO Products to the public, and represented the BPO Products only contained the ingredients listed and were free of carcinogens.

177.    Defendants violated CAL. CIV. CODE § 1750(a)(3) by representing the affiliation, connection, or association with, or certification by, another *e.g.,* the Products

were approved by dermatologists and manufactured in conformity with current good manufacturing practices.

178.  Defendants violated CAL. CIV. CODE § 1750 (a)(4) by using deceptive representations, *e.g.,* the Products were safe, validated, and supported by the latest research, and free of carcinogens such as benzene.

179.  Defendants violated CAL. CIV. CODE § 1750(a)(5) by representing the Products have characteristics, ingredients, uses, or benefits, which they do not, *e.g.,* misleading Plaintiffs and the Class members the Products only contained the listed ingredients, did not contain benzene, and did not increase the risk of the consumers' risk of cancer.

180.  Defendants violated CAL. CIV. CODE § 1750(a)(6) by representing the Products were not deteriorated unreasonably or altered *e.g.,* the Products were pure and had not degraded or formed benzene.

181.  Defendants violated CAL. CIV. CODE § 1750(a)(7) by representing the Products were pure and of a particular standard or quality, when they are not.

182.  Defendants violated CAL. CIV. CODE § 1750(a)(9) by advertising the Products with the intent not to sell them as advertised*, e.g.,* the Products were of pure quality, safe, made in conformity with current good manufacturing practices, and not adulterated.

183.  Had Defendants been truthful in advertising, labeling, packaging, warnings, and online statements about benzene in the Products and the risk of cancer, Plaintiffs and the California Subclass would not have bought the Products. Benzene, a human carcinogen, in a widely marketed and available consumer drug product, is material health and safety information Defendants knew Plaintiffs and the California Subclass would want to know. The Defendants' omission of this material information was common to all Plaintiffs and the California Subclass members and made to all Plaintiffs and the California Subclass members uniformly through common advertising, online representations, labeling, and packaging.

CLASS ACTION FIRST AMENDED COMPLAINT

184.   Defendants' acts, omissions, and concealment of material health and safety information are ongoing and continuing to cause harm. Defendants continued to market, advertise, and sell the Products to the Plaintiffs and the California Subclass without telling the public about benzene in the Products and the risk of cancer. Defendants continued to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not quantified the levels of benzene in and created in the Products during normal and expected storage conditions.

185.   Defendants engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the California Subclass and not outweighed by any benefit. Omitting and concealing material human health and safety information such as the consumers' risk of cancer from exposure to the Products is unethical, unscrupulous, and offensive.

186.   Plaintiffs and the California Subclass members suffered ascertainable economic losses because of Defendants' misconduct because they bought the Products, they otherwise would not have but for Defendants' misrepresentations.

187.   Because of Defendants' misconduct, Plaintiffs, on behalf of themselves and the California Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable under CAL. CIV. CODE § 1750, *et seq.,* including an injunction to enjoin Defendants from continuing their fraudulent business practices. The damages sought are ascertainable, uniform to the Subclass and can be measured and returned to the Plaintiffs and the California Subclass members.

**C.   FALSE ADVERTISING UNDER VARIOUS STATE STATUTES, Individually and on Behalf of the California, Hawaii, and New York Subclasses**

188.   Plaintiffs reallege and incorporates all other paragraphs in this Class Action Complaint:

---

64

CLASS ACTION FIRST AMENDED COMPLAINT

189.  Plaintiffs bring this cause of action on behalf of themselves, and all members of the California, Hawaii, and New York Subclasses, all of whom are similarly situated consumers.

190.  Defendants develops, manufactures, tests, markets, and sells the BPO Products throughout the United States. Defendants knew through the Products' development, formulation, and testing, the Products were not chemically stable when exposed to certain expected and normal environmental and storage conditions and could form benzene, as a toxic byproduct. Despite this knowledge, Defendants did not mention benzene in the Products' advertising, ingredient list, label, container, or warnings. Defendants did not tell Plaintiffs, and the Subclass members they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' containers closed.

191.  Benzene, a human carcinogen, in a widely marketed and available consumer drug product, is material health and safety information Defendants knew Plaintiffs and the Subclass members would want to know. Defendants not only omitted this material human health and safety information from advertising, online representations, blogs, labeling, packaging, and warnings, but Defendants aggressively marketed themselves as drug experts, innovators, researchers, market leaders, and committed to consumer safety.  Defendants' affirmations of safety and responsibility misled Plaintiffs, and the Subclass members, leading them to believe the Products were tested, verified, and safe.  Defendants further marketed the Products touting the approval of dermatologists, who were not aware of the presence of benzene in the Products and of Defendants' refusal to conduct adequate and meaningful testing before marketing and selling the Products to the public and following the FDA's 2022 alert to specifically look for benzene.

192.  Defendants' acts and omissions constitute false advertising. Defendants advertised the Products with the intent not to sell them as advertised. Reasonable

65

CLASS ACTION FIRST AMENDED COMPLAINT

1   consumers, including Plaintiffs and the Subclass members, exposed to Defendants

2   advertising would believe the Products were safe, verified, and free of benzene.

3       193.   Defendants' false and misleading advertising violated California's False

4   Advertising Law, Bus. & Prof. Code § 17500 *et seq.,* which prohibits Defendants from

5   disseminating statements "which are untrue or misleading, and which are known, or

6   which by the exercise of reasonable care should be known, to be untrue or misleading."

7   Defendants knew or should have known the Products formed benzene under normal,

8   handling, use, and storage conditions but did not disclose this to Plaintiffs and the

9   Subclass members. Defendants knew Plaintiffs, the Class members, and consumers

10  would be exposed to benzene in the Products, even with the Products' original

11  packaging closed.

12      194.   Defendants' false and misleading advertising violated Hawaii's False

13  Advertising Law, HI REV. STAT. § 708-871. Defendants knowingly or recklessly made

14  false and misleading statements in the Products' advertising to the public.[79]  Defendants

15  further advertised the Products with the intent not to sell them as advertised and

16  misrepresented the ingredients, quality, purity, safety, and character of the Products.

17      195.   Defendants' false and misleading advertising violated New York's General

18  Business Law § 350 *et seq.* ("GBL § 350"), which prohibits "[f]alse advertising in the

19  misconduct of any business, trade or commerce or in the furnishing of any service" in

20  New York. Under GBL § 350, "false advertising" includes "advertising, including

21  labeling, of a commodity . . . if such advertising is misleading in a material respect."

22  Defendants violated GBL § 350 by advertising and selling the Products without

23  disclosing material health and safety information, *e.g.,* benzene and the consumers risk

---

[79] HI Rev Stat § 708-871, False Advertising: (1) A person commits the offense of false advertising if, in connection with the promotion of the sale of property or services, the person knowingly or recklessly makes or causes to be made a false or misleading statement in any advertisement addressed to the public or to a substantial number of persons. (2) "Misleading statement" includes an offer to sell property or services if the offeror does not intend to sell or provide the advertised property or services: (a) At the price equal to or lower than the price offered; or (b) In a quantity sufficient to meet the reasonably- expected public demand unless quantity is specifically stated in the advertisement; or (c) at all.

of cancer from benzene. Defendants' false and misleading advertising was directed at consumers, the New York Subclass members, and the public, and caused consumer injury and harm to the public interest.

196. Had Defendants been truthful in advertising, online representations, labeling, and packaging about benzene, Plaintiffs and the Subclass members would not have bought the Products.

197. Plaintiffs, on behalf of themselves, and the California, Hawaii and New York Subclasses suffered ascertainable economic losses because of Defendants' misconduct because they bought the Products, they otherwise would not have but for Defendants' material misrepresentations.

198. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves and the California, Hawaii, and New York Subclasses, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendants from continuing their fraudulent business practices. The damages sought are ascertainable, uniform to the Subclasses and can be measured and returned to the Plaintiffs and Subclass members.

**D. DECEPTIVE TRADE PRACTICES UNDER VARIOUS STATE STATUTES, Plaintiffs, Individually and on Behalf of California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses**

199. Plaintiffs reallege and incorporates all other paragraphs in this Class Action Complaint:

200. Plaintiffs bring this cause of action on behalf of themselves, and all members of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

201. Defendants' acts and omissions constitute deceptive business practices in violation of state deceptive trade practices laws.

CLASS ACTION FIRST AMENDED COMPLAINT

202.  Defendants represented the BPO Products had characteristics, uses, and benefits, they did not, *e.g.,* Defendants represented the BPO Products were pure, of good quality, safe, and only contained the ingredients disclosed.

203.  Defendants represented the BPO Products were not deteriorated or altered, when they knew, or should have known, the BPO Products degraded to benzene under normal and expected use, handling, and storage conditions.

204.  Defendants represented the BPO Products contained only the ingredients listed on Defendants' websites, advertising, labels, and containers. Defendants did not disclose to Plaintiffs, the Subclasses, and the public that the BPO Products were at risk of benzene contamination.

205.  Defendants advertised the BPO Products with the intent not to sell them as advertised.

206.  Defendants' acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.,* enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendants.

207.  Defendants' acts and omissions violated Connecticut Unfair Trade Practices Act, CONN. GEN STAT. ANN., § 42- 110, *et seq.,* which broadly prohibits Defendants from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce such as those committed by Defendants and alleged in this Class Action.

208.  Defendants' acts and omissions violated Hawaii's Uniform Deceptive Trade Practice Act, HAW. REV. STAT. §481-A3 because Defendants: (1) caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) represented the Products had characteristics, ingredients, or benefits, they did not; (3) represented the Products were not deteriorated or altered, when they were;  (4) represented the Products were of a particular standard

**CLASS ACTION FIRST AMENDED COMPLAINT**

1  or quality when they were not; and (5) advertised the Products with the intent not to sell
2  them as advertised.

3      209.  Defendants' acts and omissions violated Illinois' Consumer Fraud and
4  Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. Defendants used deception,
5  fraud, false pretense, false promises, and omitted material health and safety information
6  about the Products' degradation to benzene, and/or contamination with benzene, which
7  Defendants intended the Illinois Subclass members to rely upon.

8      210.  Defendants' acts and omissions violated Maryland's Unfair or Deceptive
9  Trade Practices Act, MD. COM. CODE, Title 13, Subtitle 3, §13-301 because
10  Defendants: (1) represented the Products had characteristics, ingredients, uses, and
11  benefits, they did not; (2) represented the Products were not deteriorated or altered,
12  when they were; (3) represented the Products were of a particular standard or quality,
13  when they were not.  Defendants' representations about the Products' ingredients, and
14  omission of benzene were misleading, deceptive, incomplete, and not truthful in
15  violation of Maryland's Unfair or Deceptive Trade Practices Act.

16     211.  Defendants' acts and omissions violated Massachusetts consumer
17  protection law, MASS. GEN. LAWS ANN. Ch. 93A, § 1 *et seq.*, which broadly prohibits
18  unfair and deceptive trade practices such as those committed by Defendants and alleged
19  in this Class Action.

20     212.  Defendants' acts and omissions violated the Missouri Merchandising
21  Practices Act, MO. REV. STAT. § 407, *et seq.*, which prohibits the use of deception,
22  fraud, misrepresentations, or unfair practices by a business, *e.g.,* marketing Products as
23  safe, approved, tested, and only containing the listed ingredients. Missouri's law further
24  prohibits the suppression or omission of material facts such as the Products'
25  degradation to benzene.

26     213.  Defendants' acts and omissions violated N.Y. GEN. BUS. LAW § 349, which
27  prohibits Defendants from engaging in deceptive, unfair, and misleading acts and
28  practices such as those committed by Defendants and alleged in this Class Action.

Defendants' misrepresentations and omissions caused consumer injury and harm to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products.

214.  Defendants' acts and omissions violate Nevada Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52, Chapter 598 *et seq*. which prohibits Defendants from making false statements about the BPO Products and advertising the Products without the intent to sell them as advertised.

215.  Defendants' acts and omissions acts and omissions violated Ohio's Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01, *et seq*. which prohibits sales practices that are deceptive, unfair, or unconscionable, and Ohio's Deceptive Trade Practices Act, OHIO REV. CODE ANN.§ 4165 *et seq*.

216.  Defendants' acts and omissions violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 *et seq.* because Defendants: (1) caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) used deceptive representations about the Products; (3) represented the Products had characteristics, ingredients, or benefits, they did not; (3) represented the Products were not deteriorated or altered, when they were;  (4) represented the Products were particular standard or quality when they are not; and (5) advertised the Products with the intent not to sell them as advertised.

217.  Defendants' acts and omissions violated Rhode Island's Deceptive Trade Practices Act, R.I. GEN. LAWS § 6- 13.1- 5.2(B), *et seq.* because Defendants: (1) caused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) used deceptive representations in connection with the Products; (3) represented the Products had sponsorship, approval, characteristics, ingredients, uses, benefits, they did not; (4) represented the Products were not deteriorated or altered, when they were; (5) represented the Products were of a

70

particular standard, quality, or grade, when they were not; and (6) advertised the Products with the intent not to sell them as advertised.

218. Defendants' acts and omissions violated Washington's Consumer Protection Act, WASH. REV. CODE § 19.86.010, *et seq.,* which broadly prohibits Defendants from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.80 Defendants' concealment of material health and safety information about the Products, which they knew or should have known, was injurious to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products. Defendants' conduct caused harm to the Plaintiffs, the Washington Subclass members, and members of the public who bought the Products without knowing they degraded to benzene. Defendants' conduct has the capacity to cause harm to other people who buy the Products.

219. Had Defendants been truthful in its advertising, labeling, and packaging of the Products and not omitted material health and safety information about benzene in and formed from the Products, Plaintiffs and the Subclass members would not have bought the Products.

220. Defendants' acts and omissions and violations of the state consumer protection statutes are ongoing and continuing to cause harm.

221. Plaintiffs, on behalf of themselves, and members of the California, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses suffered an ascertainable economic loss because of Defendants' misconduct because they bought the Products, they would not have bought but for Defendants' misrepresentations.

---

80 Under § 19.86.090, Washington consumers harmed by such practices may recover actual damages, the costs of the suit, including reasonable attorney's fees, and the court may, in its discretion, increase the award of damages to an amount up to three times the actual damages sustained.

71

**CLASS ACTION FIRST AMENDED COMPLAINT**

222.  Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, and the Subclasses, seek recovery of their economic damages, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are ascertainable, uniform to the Subclasses and can be measured and returned.

**E.    BREACH OF EXPRESS WARRANTY, Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses**

223.  Plaintiffs reallege and incorporates all other paragraphs in this Class Action Complaint:

224.  Plaintiffs bring this cause of action on behalf of themselves, and all members of the National Class and the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

225.  The Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise. Defendants advertised and sold the Products as safe, pure, of good quality, and only containing the listed ingredients. Defendants' advertising, labels, containers, packaging, advertising, and online statements did not mention benzene, leading consumers to believe the Products were safe for their ordinary use. Defendants' affirmations were uniformly made to Plaintiffs and the Class members by Defendants in the Products' advertising, labeling, packaging, and online statements and were part of the basis of the bargain between Defendants, the Plaintiffs, the Class, and Subclass members.

226.  Defendants' affirmations and promises are unlawful. When Defendants marketed, distributed, and sold the Products, Defendants knew, or should have known, the Products degraded to benzene under normal and expected use, handling, and storage

72

conditions. Defendants knew, or should have known, the Products formed benzene and therefore did not conform to Defendants' express representations and warranties to consumers. Plaintiffs, the Class, and Subclass members purchased the Products in reasonable reliance on Defendants' statements.

227.  Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendants from continuing their fraudulent business practices. The damages sought are ascertainable, uniform to the Class and Subclasses and can be measured and returned.

**F.   BREACH OF IMPLIED WARRANTY, Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses**

228.  Plaintiffs reallege and incorporates all other paragraphs in this Class Action Complaint:

229.  Plaintiffs bring this cause of action on behalf of themselves, and all members of the National Class and the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

230.  Defendants, as sellers of the Products, also made implied warranties including warranting the Products were of the same quality and purity represented on the labels, in advertising, and on Defendants' websites, were fit for the ordinary purpose of the Products and conformed to the promises made on the containers, labels, advertising, and websites that all ingredients were listed, and all warnings given.

231.  Defendants advertised their BPO Products as safe, when they knew, or should have known, the Products degraded to benzene. Defendants did not list benzene as an ingredient or contaminant anywhere on the Products or advertising. The Products

73

CLASS ACTION FIRST AMENDED COMPLAINT

are not of the quality and purity represented by Defendants because the Products degrade to benzene under normal use, handling, and storage conditions.

232.  Defendants did not tell Plaintiffs or the Class or Subclass members the Products were not fit for their ordinary use because the Products, as advertised and sold by Defendants, degraded to benzene under normal and expected handling, use, and storage.

233.  Defendants' affirmations that the Products were safe for use were uniformly made to the Plaintiffs and the Class and Subclass members in the Products' advertising, labeling, and packaging, and on Defendants' websites, which were part of the basis of the bargain.

234.  Plaintiffs, the Class, and Subclass members purchased the Products in reasonable reliance on Defendants' statements, affirmations, and omissions of material health and safety information.

235.  Defendants' acts and omissions are ongoing and continuing to cause harm.

236.  Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class, and Subclasses, seek recovery of their actual damages, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendants' Products.

**G.    UNJUST ENRICHMENT, Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses**

237.  Plaintiffs reallege and incorporates all other paragraphs in this Class Action Complaint:

238.  Plaintiffs bring this cause of action on behalf of themselves, and all members of the National Class and the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

**CLASS ACTION FIRST AMENDED COMPLAINT**

239. Defendants have unjustly profited from their deceptive business practices and kept the profits from Plaintiffs, the Class, and Subclass members who purchased the Products.

240. Defendants requested and received a measurable economic benefit at the expense of Plaintiffs, the Class, and Subclass members as payment for the Products. Defendants accepted the economic benefits from Plaintiffs, the Class, and Subclass members knowing the economic benefit received was based on deception and omission of material human health and safety information.

241. There is no utility in Defendants' misconduct and Defendants' enrichment from the misconduct is unjust, inequitable, unconscionable, and against the strong public policy to protect consumers against fraud.

242. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, and the public seeks recovery of their actual damages, disgorgement of profits, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendants' Products.

## XIII. PRAYER FOR RELIEF

243. WHEREFORE, Plaintiffs pray for judgment against Defendants:

244. That the Court determine this action may be maintained as a Class Action under Rule 23(a) and (b)(1), (2) and (3) of the Federal Rules of Civil Procedure;

245. That Defendants' misconduct be adjudged to have violated the state consumer protection laws identified herein;

246. That injunctive and declaratory relief be awarded against Defendants, including but not limited to an order prohibiting Defendants from engaging in the alleged misconduct;

247.  That Defendants be ordered to disgorge profits and revenues derived from their course of misconduct and that such unjust enrichment be restored to the class and or distributed *cy pres* as the Court shall deem just and equitable;

248.  That Plaintiffs recover all compensatory damages and other damages sustained by Plaintiffs;

249.  That Plaintiffs recover punitive damages as allowed by law;

250.  That Plaintiffs recover all statutory damages as allowed by law;

251.  That Plaintiffs recover their attorneys' fees and all costs of suit;

252.  That Plaintiffs recover all Statutory pre-judgment and post-judgment interest on any amounts; and

253.  That all further relief as this Court may deem just and proper be granted.

**XIV. DEMAND FOR JURY TRIAL**

254.  Demand is made for a jury trial.

Dated:  May 24, 2024

**WISNER BAUM LLP**

By:  */s/ R. Brent Wisner*
    R. Brent Wisner, Esq.
    rbwisner@wisnerbaum.com
    Stephanie Sherman, Esq.
    ssherman@wisnesrbaum.com
    11111 Santa Monica Blvd, #1750
    Los Angeles, CA 90025
    Telephone: (310) 207-3233
    Facsimile:  (310) 820-7444

    *Attorney for Plaintiffs and Classes*

CLASS ACTION FIRST AMENDED COMPLAINT